# 𝔖taunton

## Susan G. Holloway v. Milton G. Smith, Et Al.

September 14, 1955.

Record No. 4390.

Present, Eggleston, Spratley, Buchanan, Miller, Smith and Whittle, JJ.

The opinion states the case.

*John G. Drake* and *J. Walter White*, for the plaintiff in error.

*James H. Simmonds* and *Howard M. Murphy*, for the defendants in error.

SPRATLEY, J., delivered the opinion of the court.

This is a motion by Susan G. Holloway against Milton G. Smith, Maude B. Smith and Warren W. Ten Brook, partners trading and doing business as Greenwood Sales & Service, to recover judgment on a certain negotiable note, dated August 24, 1951, and signed "Greenwood Sales Service by Warren W. Ten Brook, Partner," payable to the order of Susan G. Holloway.

Milton G. Smith and Maude B. Smith filed grounds of defense, denying that they were partners at the time of the execution of the said note; or that the signature thereon was a genuine signature of any partnership of which they were or had been partners; or that Ten Brook was authorized to execute the same, so as to bind them or any partnership in which they were or had been partners. They further alleged that the loan was made to Ten Brook for the purpose of allowing the latter to make his initial capital contribution into the business known as Greenwood Sales & Service, and that the obligation to repay the said loan was solely that of Ten Brook.

Ten Brook did not file any plea or grounds of defense.

By consent of the parties, the case was heard by the trial court without a jury, and the court rendered judgment against Ten Brook, and in favor of Milton G. Smith and Maude B. Smith, sometimes hereinafter referred to as appellees or defendants. The case is here upon a writ of error to the judgment in favor of the Smiths.

There are several questions raised; but the principal and controlling issue is whether Warren W. Ten Brook, acting as a partner of the firm of Greenwood Sales & Service, executed the note sued on for "apparently carrying on in the usual way the business of the partnership" of which he was a member. Code, § 50-9 (1).

The evidence will be set out somewhat in detail.

It appears that prior to July, 1951, Warren W. Ten Brook was employed by Frank R. Spicer as manager of the latter's business of selling new and used cars, and the operation of a gasoline and garage service station, under the name of Greenwood Sales & Service. Spicer offered to sell the business to Ten Brook; but the latter did not have sufficient funds to make the purchase. Ten Brook went to Milton G. Smith, who was engaged in the building and real estate business, for advice and aid in securing the money to buy the business. Smith suggested that he and his wife, Maude B. Smith,

join Ten Brook in buying the business, each person acquiring a one-third interest therein.

On July 3, 1951, a contract of sale was executed by Frank R. Spicer conveying the property and business of Greenwood Sales & Service to Milton G. Smith, Maude B. Smith, and Ten Brook. The consideration was $22,894.17, of which the Smiths paid in cash $7,500, the balance to be paid on or before July 28, 1951. On or about the latter date the Smiths paid the deferred amount.

Possession of the property was immediately taken by the three purchasers, and the newly acquired business continued in operation as before, and under the same name, that is, Greenwood Sales & Service. According to Mr. Smith, he and Mrs. Smith "were to take care of the finances and things like that, and Ten Brook was to be the general manager of the business." A written partnership agreement dated July 3, 1951, was executed, bearing an acknowledgment of the signatures of Mr. and Mrs. Smith and Ten Brook before a notary public as of October 25, 1951. This agreement provided that the initial capital of the partnership should consist of $25,800, to be contributed in equal amounts by the partners. It recited that the Smiths would advance to Ten Brook $2,600, for which Ten Brook should execute a note payable to the Smiths, the note to be curtailed by Ten Brook "from his share of the profits over and above his salary" of $125 per week. It was further set out that Ten Brook should devote his entire time and attention to the business; that "each partner should have an equal voice in the management and conduct of the said business;" and that the bank account of the partnership should be carried at a certain bank and all partnership checks should be signed by either Maude B. Smith or Milton G. Smith. There was no other limitation upon the authority of Ten Brook to conduct the business, or with respect to borrowing of money, or executing notes, on behalf of the firm.

Milton G. Smith promptly applied for a license to conduct the newly acquired business as a partnership, filing therewith a statement that the partnership was formed on July 3, 1951, between him, Mrs. Smith and Ten Brook. However, no partnership certificate as required by Code, § 50-74 was filed in the office of the Clerk of the Circuit Court of Arlington County. On July 3rd, Smith opened an account in the bank in the name of Greenwood Sales & Service and furnished financial statements to that bank and other banks that the business of the partnership was begun on July

3, 1951. In the conduct of its business, Greenwood Sales & Service borrowed from local banks various sums of money ranging from $1,800 to $11,000. The partnership name was signed by Milton G. Smith to each of the notes given therefor, except the one for $11,000, which was signed, in the name of the partnership, by both Milton G. Smith and Ten Brook, on September 23, 1952. The three partners endorsed each of the notes.

Mrs. Holloway testified that having received some money from her late husband's estate, she made some inquiries among her friends as to how she could invest the funds; that one of those with whom she talked was Ten Brook, a personal acquaintance, whom she knew to be engaged in the operation of Greenwood Sales & Service; that she knew that Mr. and Mrs. Smith were "connected" with Greenwood Sales & Service, and that they also seemed to be "doing well in the real estate business;" that Ten Brook represented to her that he and Mr. and Mrs. Smith owned Greenwood Sales & Service and that their firm wanted to borrow some money for use in its business; and that after making further inquiry about Greenwood Sales & Service, and being advised that it was engaged in a "growing business," she told Ten Brook she would make it a loan of $6,000.

Ten Brook came to Mrs. Holloway on August 24, 1951, and she gave him her check, dated as of that day, for $6,000, payable to the order of "Greenwood Sales & Service;" and Ten Brook immediately gave to her the promissory note sued on, payable two years after date with interest at 5% per annum. She was most positive that the loan was made to the partnership and not to Ten Brook individually. Asked if there was any reason why she did not make the check payable to Ten Brook, she replied: "Yes, it was not for him in the first place. It was for the company itself." Asked how she knew how to make out the check, she replied: "I knew I was going to make the agreement with Greenwood Sales & Service."

Ten Brook testified that on July 3, 1951, the date of the contract of sale from Spicer, he and the Smiths immediately started to operate the business as a partnership under the name of Greenwood Sales & Service. He said they got off to a "shaky" start because they did not have sufficient operating capital; that they had to sell some used cars at a loss in order to get funds to operate; and that the partners were continually discussing ways and means of raising money. Knowing that money was being borrowed for the firm from banks, and that Mrs. Holloway had some funds to invest, he went to her,

told her that he was in business with the Smiths, and asked her if she was interested in making a loan to that business, Greenwood Sales & Service. When she informed him that she would be willing to let Greenwood Sales & Service have $6,000 at 5% interest, he went to her apartment on August 24, 1951, "picked up" the check for $6,000, and gave her the note of the partnership. The check endorsed "For Deposit Greenwood Sales & Service," was honored by the bank and its proceeds credited to the account of the payee and endorser, Greenwood Sales & Service.

Ten Brook said further that, prior to obtaining the loan, he told the Smiths he thought he could borrow some money for the firm from Mrs. Holloway; that Mr. Smith made two trips to the business place of Greenwood Sales & Service to find out whether or not he had gotten the loan; that after he received the check he immediately gave it to Mrs. Smith, who handled the financial end of the business; that the check was deposited in a bank and the proceeds were withdrawn therefrom by Greenwood Sales & Service, and used in the operation of its business, the "trading and buying and selling of automobiles." Ten Brook said that he had no available funds, and that was the reason why the agreement provided that his contribution to the capital should come out of his share of the profits over and above his salary; that he had "no way to raise any capital;" and that the Smiths were to lend him the entire $8,600, including the note for $2,600, which he gave to them. He was most positive in his statements that the money was borrowed in the name of the partnership for the purpose of carrying on its business; and that the Smiths knew of the loan and were anxious to obtain it at a 5% interest rate.

Milton G. Smith did not deny that a partnership was to be formed; that he and his wife took title to the business jointly with Ten Brook; and that the business was operated by the three of them jointly from the date of its purchase. He said, however, that the partnership was not to come into existence until Ten Brook had made his agreed contribution to the capital; that Ten Brook told him that he had borrowed $6,000 from a friend as a part of such capital contribution; that the partnership was not formed until October 25, 1951, the day when the signatures to the written agreement were acknowledged; and that, therefore, the loan of Mrs. Holloway was made prior to the formation of the partnership. He stated that he advanced Ten Brook $2,600, in accordance with

their agreement, and that the latter gave the firm a note for that amount on July 25, 1952. He pointed out that the above note and the $6,000 obtained from Mrs. Holloway provided exactly one-third of the capital of the business, the amount agreed to be contributed by Ten Brook.

Both Milton G. Smith and Mrs. Smith said they did not know that Ten Brook had obtained the $6,000 for the partnership or had executed a note in its name, either when the loan was made or when the proceeds of the check of Mrs. Holloway were deposited to the credit of Greenwood Sales & Service. They denied that they had ever asked Ten Brook to borrow the money for the partnership, or had authorized him to sign the note. They said that all of the loans made by the firm were endorsed by the partners, except the notes given for the purchase of motor vehicles.

The bank records showed that the proceeds of Mrs. Holloway's check were deposited, as Ten Brook said, to the credit of Greenwood Sales & Service. The money was thereafter withdrawn by either Mr. or Mrs. Smith, and used for carrying on the business of the partnership.

On January 16, 1953, the Smiths advised Ten Brook by letter that they were terminating the partnership set forth in the agreement dated July 3, 1951.

Mrs. Holloway held the note until shortly before it became due. When she presented it for payment, payment was refused. She then brought this action.

There was considerable other evidence of an immaterial nature. The controlling facts are not in conflict; but we have stated much of the defendants' evidence to explain their contentions. The testimony of Ten Brook and Mrs. Holloway as to the loan agreement is without conflict. They were the only witnesses acquainted with the facts surrounding the making of the loan. There is a conflict with respect to the dealings between Ten Brook and his copartners; but it is not claimed that Mrs. Holloway had notice of any restriction on Ten Brook's authority to bind the partnership or knowledge of any agreement with respect to his contribution to the capital of the partnership.

■ There is no merit in the contention of the Smiths that the partnership did not come into being until after the note in suit was signed. The documentary evidence conclusively shows that the partnership was formed on July 3, 1951. The oral evidence and

the attendant circumstances support the same conclusion. Upon the formation of the partnership, whether by oral or written agreement, each of the copartners assumed the hazards which attach to the acts of every partner within the scope of the partnership's business.

Greenwood Sales & Service was a trading or commercial partnership, and in the course of its business, it borrowed money for carrying on its business in the usual way. We do not know whether the provisions of the written agreement varied in any respect from the terms of any oral agreement between the parties prior to October 25, 1951. At any rate, the written agreement prevails over the oral, if any. The written agreement provided that each partner should have an equal voice in the conduct of the business. There was no limitation, as we have said, with respect to the borrowing of money, or to the execution of notes, on behalf of the firm. Each partner was an agent of the partnership for the purpose of its business.

It is positively affirmed and undisputed that Mrs. Holloway's agreement with Ten Brook was to lend $6,000 to the partnership. It is undisputed that the check evidencing the loan was accordingly made payable to the partnership, was carried to the bank by Mr. or Mrs. Smith, deposited by one of them to the credit of the partnership, and the funds thereafter used by it in carrying on in the usual way its business. We are not told why the $6,000 was deposited to the credit of the partnership, if it was obtained by Ten Brook for his contribution to the capital of the partnership, instead of being turned over to the Smiths. If Milton G. Smith paid, as he said, the entire purchase price of the business, it would appear that he was personally entitled to the money in reimbursement of his advancement.

The liability of a partnership for the acts of a partner is clearly stated in Code, § 50-9, which reads as follows:

"(1) Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

\*       \*       \*       \*       \*       \*       \*

"(4) No act of a partner in contravention of a restriction on his authority shall bind the partnership to persons having knowledge of the restriction. (Acts 1918, p. 543; Michie Code 1942, § 4359(9).)"

In *Hobbs* v. *Virginia National Bank*, 147 Va. 802, 128 S. E. 46, 133 S. E. 595, Crump, P., in an able and exhaustive opinion, set out the principles which apply for ascertaining the liability of partners in a trading or commercial partnership with respect to a third person for the acts of a partner. In that case, the court approved the following instruction:

"The jury are instructed that, under the law, each member of a partnership is the agent of the other members and that when created each partner has full power and authority to bind all the partners by his acts or contracts in relation to the business of the partnership, including the borrowing of money and the making and delivery of the notes of the partnership therefor; and as between the firm, and third persons dealing with them in good faith, it is of no consequence whether the partner is acting in good faith with his co-partners or not, provided the act is done within the scope of the partnership business and professedly for the firm."

President Crump cited *Commercial Bank* v. *Miller*, 96 Va. 357, 365, 31 S. E. 812, where the court quoting with approval from Daniel on Negotiable Instrument, § 357, held it to be "settled law," that "the borrowing of money and negotiation of bills and notes being incident thereto, and usual in, the business of co-partnerships formed for the purpose of trade, it follows that when a copartner borrows money professedly for the firm and executes therefor a negotiable instrument in the copartnership name, it will bind all the partners, whether the borrowing was really for the firm or not, provided the lender is not himself cognizant of the intended fraud, and the burden will not be thrown on him to show that he was not cognizant of such fraud, or to prove value given for the paper."

It is settled law in Virginia, both by statute and in numerous decisions that a partner is an agent of the firm for the purpose of the partnership business, and may bind all partners by his acts within the scope of such business. It is of no consequence whether the partner is acting in good faith with his copartners or not, provided the act is within the scope of the partnership's business and professedly for the firm, and third persons are acting in good faith. 14 M. J., Partnership, § 27, page 221.

This is also the general rule elsewhere. 40 Am. Jur., Partnership,

§ 159, page 242, and 68 C. J. S., Partnership, § 161 a, at page 604.

Pertinent here is this statement from 40 Am. Jur., Partnership, § 11, at page 134: "The character and nature of partnerships ordinarily determine the powers and liabilities of different classes of partners. In this connection, the most important distinction exists between trading or commercial partnerships and those which are not organized for the purpose of trade or commerce. Greater powers are impliedly given to members of the former as compared with the second type of partnership, such as in the matter of drawing or endorsing negotiable instruments. * * *"

The Smiths selected Ten Brook as their partner. The partnership was a going concern when the $6,000 note was executed. In the absence of a restriction on his authority, known to Mrs. Holloway, Ten Brook had the same power to bind the partnership as his copartners had. Ten Brook, as the agent of the partnership, solicited the loan professedly for the firm, and executed the note evidencing it, for "apparently carrying on in the usual way the business of the partnership" of which he was a member. Code, § 50-9.

When we apply the provisions of Code, § 50-9 to the material and pertinent evidence relating to the making of the loan, and the execution of the note, we can reach but one conclusion, and that is, the acts of the partner, Ten Brook, bound the partnership. In reaching that conclusion, we are not unmindful of the respect which attaches to the judgment of the trial court, but when a judgment is plainly wrong or without evidence to support it, it becomes our duty to set it aside. Code, § 8-491. *Gillespie* v. *Somers*, 177 Va. 231, 237, 13 S. E. (2d) 330; *Ramey* v. *Ramey*, 181 Va. 377, 381, 25 S. E. (2d) 264; *Malbon* v. *Davis*, 185 Va. 748, 757, 40 S. E. (2d) 183, *Esso Standard Oil Co.* v. *Stewart*, 190 Va. 949, 951, 59 S. E. (2d) 67; *Whichard* v. *Nee*, 194 Va. 83, 89, 72 S. E. (2d) 365; *Sutton* v. *Sutton*, 194 Va. 179, 190 72 S. E. (2d) 275; *Thalhimer Bros.* v. *Buckner*, 194 Va. 1011, 76 S. E. (2d) 215.

For the reasons stated, the judgment of the trial court in favor of Milton G. Smith and Maude B. Smith will be reversed and set aside, and since the facts before us are such as to enable us to attain the ends of justice, judgment will be here entered against Milton G. Smith and Maude B. Smith, the remaining partners in business trading as Greenwood Sales & Service, in favor of the appellant, Susan G. Holloway, for the sum of $6,000, with interest at 5%

from August 24, 1951, to August 24, 1953, the rate prescribed by the aforesaid note, and thereafter at the legal rate until paid, plus attorney's fee as prescribed in said note, and her costs in this behal· expended, Code, § 8-493.

*Reversed and final judgment.*